## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CATHY APODACA, and her minor
child, Abel Apodaca, by his mother
and next friend; and JOSE APODACA,

      Plaintiffs,

  vs.                                                                        CIVIL NO. 97-1019 LH/LFG

BOYD MAZER and CARMEN MAZER,
dba North Court Mobile Home Park,

      Defendants.

## RECOMMENDED DISPOSITION ON THE ISSUE OF DAMAGES [1]

Plaintiff Cathy Apodaca, for herself and her minor child, Abel Apodaca, and Plaintiff Jose

Apodaca brought this action for declaratory judgment, injunctive relief and damages under the Fair

Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*

On February 11, 1998, default judgment was entered in favor of Plaintiffs on the issue of

liability [Doc. 46].  Pursuant to the March 4, 1998 Order of Reference, the matter was set for a

hearing on damages.  The Court conducted the hearing on April 23, 1998.

Notice of the damage hearing was given to Defendants, Boyd Mazer and Carmen Mazer, and,

in addition to the formal notice of hearing, the Court sent a letter to the Mazers which reads as

follows:

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendation, that
party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendation.  A
party must file any objections with the time period allowed if that party wants to have appellate review of the
findings and recommendation.  If no objections are filed by May 18, 1998.

You failed to appear for the pretrial conference set for April 10, 1998. At the conference, the Court directed that proposed findings of fact and conclusions of law, together with any exhibits that a party wishes to introduce, be submitted to the Court five days prior to trial.  Thus, if you intend to participate in the upcoming damage trial, you must submit your proposed findings of fact, conclusions of law and proposed exhibits to the Court with the time required.

A trial on the issue of damages will be conducted as scheduled.  Even though a judgment on liability has been entered against you, you are still entitled to be heard on the issue of unliquidated damages.  Burge v. Mid-Continent Cas. Co., 123 N.M. 1, 933 P.2d 210 (1996); Gallegos v. Franklin, 89 N.M. 118, 547 P.2d 1160 (Ct. App.), *cert. denied*, 89 N.M. 206, 549 P.2d 284 (1976).

Should you fail to submit proposed findings of fact, conclusions of law or your trial exhibits, the Court may consider your non-compliance as a waiver of a right to be heard on the issue of damages.

Notwithstanding the Court's formal notice of setting or the letter advising the Defendants of the damage hearing, they failed to appear to challenge any of the testimony presented.

The Court heard the sworn testimony of the Plaintiffs and their witnesses, reviewed the exhibits introduced into evidence and considered the arguments and authorities of counsel; and, based on the foregoing, proposes that the District Court enter the following findings of fact, conclusions of law and recommended disposition.[2]

### Findings of Fact and Conclusions of Law

1.  At all relevant times to the incidents discussed herein, Boyd Mazer and Carmen Mazer owned and operated the North Court Mobile Home Park ("Park"), located at 10014 Second Street, N.W., Albuquerque, New Mexico.

---

[2] On March 5, 1998, the District Court issued an order of reference directing that the Magistrate Judge perform legal analysis, conduct hearings and issue a recommendation for disposition [Doc. 47].

2.  Rafael Padilla, a lawyer and real estate investor, together with his spouse, owned various mobile homes.  The Padillas leased space for their homes in the Park, and they rented their mobile homes to tenants.  In July 1995, Rafael Padilla and his spouse had seven mobile homes located at  the Park available for rent, including a 1968 Marlett single-wide trailer.  This trailer was located in Space No. 2.

3.  Albuquerque's northwest valley is considered a prized location and mobile home vacancies in this area are rare.  A prior tenant of the mobile home located in Space No. 2 vacated the premises, and shortly after Padilla published notice of the vacancy, Padilla received twenty applications, including one submitted by Plaintiff, Cathy Apodaca ("Apodaca").

4.  Apodaca was interested in renting a home at the Park because the neighborhood was quiet and offered a flavor of "country living."  Moreover, the Park was convenient to her place of work and to shopping areas.  City bus service was also available on 4th Street, making transportation to and from school and work readily available for her minor son, Abel.

5.  Rafael Padilla and his spouse felt the Apodacas would be excellent tenants.  Apodaca is a hard-working professional woman raising two sons, one adult son, Jose Apodaca, and one teenager, Abel Apodaca.  The Padillas believed that the Apodaca family was close knit and very supportive of one another and would be good tenants.

6.  On July 28, 1995, Rafael Padilla rented the 1968 Marlett trailer to Apodaca on a month-to-month tenancy.  While the agreement was a month-to-month tenancy, as required by the Park's rules, Rafael Padilla and Apodaca orally agreed that the Apodacas would stay a minimum of six months.

7.  The Apodacas were desirous of owning their own home, and contemplated buying either a traditional home or a mobile home within a year of their move to the Park.  Upon purchasing a

home, Apodaca would have incurred moving costs, utility hook-up charges, and mobile home set-up costs.

8. Apodaca paid Rafael Padilla a monthly rent of $625, plus gas and electrical utilities if the monthly fees for gas and electricity exceeded $65; Padilla, in turn, paid space rental fees to Boyd and Carmen Mazer.

9. Pursuant to an agreement between Rafael Padilla and the Park's owners, Boyd Mazer and Carmen Mazer, Padilla could rent his mobile homes to tenants, but the Mazers needed to approve the tenants as appropriate Park residents, and the tenants were required to comply with the Park's rules.

10. After Apodaca's execution of her rental agreement with Padilla, she arranged to move into the Park. On the day the Apodacas were moving in, the Park's manager, Eugene Padilla, confronted Apodaca and told her they could not move in because Boyd Mazer had not approved the agreement.

11. The Apodacas contacted Rafael Padilla, who, in turn, spoke with Eugene Padilla to see why his tenants could not move in. Eugene Padilla, stated that "They are not acceptable." Eugene Padilla expressed concern that the Apodaca's teenage son, Abel Apodaca, was wearing a hairnet and concluded that the younger Apodaca was undesirable and would be "inviting other undesirables into the park."

12. In a pretrial deposition, Eugene Padilla and his spouse, Bernadette, testified that Boyd Mazer had instructed them not to rent to families that had teenagers.

13. Rafael Padilla, argued with the park manager and stated that Abel Apodaca was a polite young man who was violating no law or park requirement, and, ultimately, Eugene Padilla relented and allowed the Apodacas to move in.

4

14. Following this initial conflict during the Apodaca's move to the Park, the park manager, Eugene Padilla, would often glare at the Apodacas and by his stares, mannerisms and conduct, expressed his displeasure at their presence.

15. Shortly after the Apodacas moved into the Park, Rafael Padilla had a conversation with Boyd Mazer. Referring to the Apodaca family, Mazer advised Rafael Padilla, "You need to evict those people in Space No. 2." He further said, "Dogs are dogs and teenagers are teenagers. Dogs attract dogs and teenagers attract teenagers."

16. Boyd Mazer told Rafael Padilla that the former owner had allowed the park to fall apart, and that he, Mazer, was "going to clean it [up]." As part of his instructions to "clean up the park," Mazer directed Rafael Padilla to also evict the tenants in Space No. 36, because they, too, had teenagers. The tenants in Space No. 36 rented their mobile home as a couple, without children. However, as a result of a court ruling relating to custody of children from a prior marriage, the tenants obtained custody of the teenagers. The tenants checked with Rafael Padilla as to whether the teenage sons could live at the mobile home park, and Rafael Padilla assured them they could. Now, after the Mazers regained control of the park, they wanted the tenants evicted because they had teenagers living with them at the Park.

17. Rafael Padilla refused to evict either the tenants in Space No. 36 or the Apodacas in Space No. 2, and warned both Boyd Mazer and Carmen Mazer, "If you ask me to evict them because they have teenagers, we'll end up in court." Padilla advised Mazer that the tenants had done nothing wrong and evicting them because of family status could result in lawsuits.

18. Rafael Padilla testified that on his refusal to evict these families, Boyd Mazer became upset and seemed out of control. Carmen Mazer, who was present during the conversation, stated,

"Don't worry about it, we'll find a way to get rid of them."

19.  Thereafter, Apodacas noticed that they were being closely monitored by Boyd Mazer and his park managers.  Boyd and Carmen Mazer would glare at the Apodacas.  On occasion, teenage guests of Abel Apodaca were told to leave the Park by the park manager, even though they had not violated any park rules nor were they engaging in loud or boisterous conduct.  This conduct denied the Apodacas their rights of peaceful enjoyment of their premises.

20.  Shortly after Rafael Padilla declined to evict the Apodacas because they had a teenager in the family, Boyd Mazer began parking a septic sewer truck in front of the Apodacas' home, and, at times, blocked their driveway.  Prior to this, the septic sewer truck had been parked at another location, away from the tenants' residences.

21.  The Mazers' septic sewer truck emitted strong, foul odors.  The truck was parked directly in front of the Apodacas' home, at times, blocking the Apodacas' driveway.  The Apodacas testified that both the presence of the truck and the odors it emitted significantly interfered with their peaceful enjoyment of the premises.  They could not keep their windows open because of the odor and, further, could not turn on the air conditioner because it, too, drew foul smells into the Apodacas' residence.

22.  The Apodacas complained to Rafael Padilla about the septic truck and advised that the odor was offensive and parking the truck at their residence was improper.  As a result of the complaints, Rafael Padilla met with Boyd Mazer and asked that the truck not be parked in front of the Apodacas' home.  Padilla told Mazer that there was ample space to park the septic truck away from residences, and that the presence of and odor from the truck was offensive.  Boyd Mazer was irate at Padilla's request to move the truck, declined to move it, and told Padilla "I'm the owner; I'll

do whatever I want."

23.  The Apodacas testified that Boyd Mazer waged a campaign of harassment that included glares and "dirty looks," peering into their windows, walking around their trailer, both day and night, and parking his pickup truck next to the trailer so he could sit and observe the Apodacas.

24.  Jose Apodaca, the eldest son, testified as to two incidents involving Boyd Mazer.  On one occasion, Jose heard a noise outside the window and opened the blinds only to see Mazer standing outside the trailer and peering into the trailer's window.  On another occasion, Jose Apodaca was in the trailer and saw Boyd Mazer looking into the trailer through an open window.

25.  Abel Apodaca testified that on other occasions, he heard footsteps outside the window and around the trailer.  On those occasions, he saw Mazer's pickup truck parked outside of their kitchen.

26.  Jose Apodaca testified that he felt a lack of privacy in his home and believed that Boyd Mazer was constantly watching the Apodaca family.  Jose was no longer comfortable after a shower walking around with a towel on or in his underwear because he thought Mazer might be looking in through the windows.

27.  Boyd Mazer's conduct toward the Apodacas was wilful, malicious and wrongful, and was calculated to compel the Apodacas to abandon their tenancy.

28.  The Mazers' conduct toward the Apodacas made the entire family apprehensive.  The Apodacas were even afraid to "cross his path" out of concern that Boyd Mazer would force them to leave.  Cathy Apodaca ordered her children to maintain a "low profile" and not do anything to antagonize the Mazers.

29.  To avoid causing problems, both Apodaca children spent more and more time away from

their home so as not to exacerbate the situation; when at home, the Apodaca children were compelled to remain inside their mobile home to lessen the likelihood of an encounter between them and the Mazers or their park managers. The Apodaca family was laboring under significant stress. The Apodaca boys could not have friends or visitors over, and the presence of the septic tank truck in front of their home discouraged visits and outdoor activities. Cathy Apodaca felt humiliated and embarrassed with the constant surveillance of her children because she felt that the Mazers viewed her and her family with contempt.

30.   Jose Apodaca worked with a company that repossessed and sold mobile homes. He assisted his mother, during the first six months of their tenancy, in looking for a mobile home that would fit the Apodacas' family needs. In that way, they could relocate and avoid the difficulties being experienced at the Park. The Apodacas wanted to move from the Park and were in the process of pricing homes.

31.   The Apodacas contemplated relocating within one year from the date they originally moved into Park.

32.   In December 1995, without prior consultation with Rafael Padilla, and for no apparent cause, Boyd Mazer sent the Apodaca family a notice of eviction. The notice did not state any grounds or basis for the eviction. The Apodacas were current in all rental payments and had not violated any term or condition of their rental agreement, nor had they violated any term or condition of the park rules. The same notice of eviction was sent by Boyd Mazer to Rafael Padilla. The Apodacas were ordered to leave within thirty days.

33.   Upon learning of the proposed eviction, Rafael Padilla called Glen Davis, who was then the Mazers' park manager, and asked why the Apodacas were being evicted. Glen Davis simply

stated, "Boyd wants them out." Rafael Padilla challenged the explanation and asked if the Apodacas had broken any park rules, if they had been noisy, caused high traffic, or otherwise done something wrong. Davis could not give any basis for the eviction other than the fact that the Mazers wanted them out.

34. Boyd Mazer and Carmen Mazer's eviction of the Apodacas was undertaken in knowing violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* The Apodacas were being evicted because of their family status, that is, because Cathy Apodaca had children. Apodaca's damages were directly and proximately caused by the Mazers.

35. Rafael Padilla advised the Apodacas that he was their landlord and that the Mazers could not evict the Apodacas. Rafael Padilla offered to assist the Apodacas in challenging the eviction in court. However, Cathy Apodaca was crying and upset. The situation had become intolerable, and the Apodacas were forced to make immediate plans to relocate.

36. Given the shortness of time between the notice and eviction date, it was necessary that the Apodacas quickly look for substitute housing.

37. The Apodacas' realtor testified that newspaper ads and multi-listing reports for the time period when the Apodacas were looking for substitute housing showed that comparable housing in the north valley area was not available for the same price that the Apodacas were paying.

38. Apodacas made a good-faith effort to secure comparable housing and were unable to find available housing.

39. The Apodacas were able to locate a rental space at another mobile home park located on the west mesa. This park was farther away from Cathy Apodaca's place of work and would mean commuting an additional six miles a day. The location of the new mobile home park would mean that

9

Jose Apodaca, as well, would have to travel further distances to and from work.  Further, it did not have ready access to City bus service, as did the North Court Mobile Home Park, which meant that Abel Apodaca would lose his ability to ride the bus to and from school, work, town and social events. However, vacant mobile home spaces were not readily available and the Apodacas decided to secure this space on the west mesa.

40. The Apodacas checked with various mobile home dealers in an effort to find comparable housing to purchase, but learned that the used mobile homes that were available for sale could not be moved into the new mobile home park because of their park regulations.

41. The Apodacas made arrangements to buy a new mobile home that could be moved into the west side mobile home park.  The mobile home they purchased was a new double wide trailer. This home was newer and larger than the home they rented.   The purchase price was $58,356, and Apodaca was required to borrow $3,000 for the down payment.  Because she did not have that money, she was forced to take a $2,000 advance on her credit card for the down payment.  While Apodacas were forced to spend money on their down payment sooner than anticipated, they have acquired value and equity in their new home.  If they remain in the new home, they enjoy the benefit of their expenditure.  If they choose to sell, they'll likely recover their equity.  Thus, they should not be entitled to recover their down payment from the Mazers.

42. Apodaca's mortgage payment on the replacement housing was $417 per month, and the space rental at the new park was $315, for a total of $732.  The difference between Apodaca's new payment and her former payment of $625 is $107 more per month.  Apodacas should recover the difference between what they were paying for the denied housing and the cost or "cover" of the replacement housing for an additional six months, representing the Apodacas' intended move-out

date, for a total of $535.00.

43.   Utility payments at the Apodaca's new home were higher because the home was larger. The Court is unable to determine within the requisite degree of reasonable certainty how much more the Apodacas are paying in utility bills.  In the absence of reasonable certainty, the Apodacas' request for reimbursement of utility bills will be denied.

44.   Cathy Apodaca incurred $393.84 in utility hook-up charges for the new mobile home. While these hook-up charges may have eventually been incurred had Apodaca purchased a mobile home, the forced eviction required Apodaca to reallocate income and expend funds on the new mobile home that she was not prepared to spend and had no plans on spending for at least an additional six months.  Apodaca should recover the utility hook-up charges of $393.84.

45.   Apodaca incurred a damage deposit and application fee of $335 at her mobile home park. However, the damage deposit will be reimbursed to her when she vacates her new park.  Accordingly, this figure should not be reimbursed to her by the Mazers.  The Court will order reimbursement of the $35 application fee.

46.   Apodaca incurred expenses of $204.50 because a deck was required for the new home and further incurred landscaping expenses of $210.  While these expenses would not have been incurred, but for the eviction, they have also improved her new home and constitute a capital improvement, which is likely recoverable on a resale.  Accordingly, these figures should not be reimbursed to Apodaca.

47.   Apodaca incurred an $80 expense to remove the hitch from her new mobile home because the park did not allow hitches on mobile homes.  While this expense may well have been incurred had she not been evicted and purchased a new mobile home, she was neither prepared to nor had planned

on spending this money.  Apodaca should recover $80 from the Mazers.

48.  Apodaca incurred miscellaneous expenses of $21.79 in acquiring household items that were not included in her new mobile home, i.e., tissue paper holders, towel racks, etc.  However, these items constitute improvements to her premises and should not be recoverable from the Mazers.

49.  Apodaca incurred expenses of $22 for carpet cleaner rental and cleaning supplies for her former residence.  These expenses would have been incurred when she ultimately vacated the premises.  Therefore, this expense is not recoverable.

50.  Throughout their tenancy, the Apodacas were denied quiet enjoyment and privacy in their home in the Park as a direct result of the malicious and wrongful conduct of the Mazers.  They were paying $625 per month for a six-month period, and as a result of the Mazers' conduct, were denied the full benefits of their tenancy.  Apodacas are entitled to a reimbursement from the Mazers for all of the rent paid during the six-month period of their tenancy, for the total amount paid of $3,750.

51.  The Apodacas incurred additional mileage costs related to the greater distances they have to travel from their new home to work, school, shopping and social events.  The Court will award a total amount of $350 for all increased mileage changes incurred by all of the family members for the entire five-month period.

52.  Mazers' malicious and wrongful conduct caused significant emotional distress, embarrassment and humiliation.  Apodaca's minor son, Abel Apodaca, was aware that his family was being scrutinized, harassed and even despised because of his status.  He felt that he was the  cause of his mother's worry and knew that he had done nothing wrong to incur the Mazers' wrath.   Abel felt guilty that somehow he caused his family to be uprooted.  The Mazers' conduct caused Abel to lose sleep, to be denied access to his friends, to lose the right of privacy and to suffer embarrassment

and humiliation.  He is entitled to reimbursement for emotional harm in the amount of $5,000.

53.  Cathy Apodaca suffered emotional distress, embarrassment and humiliation.  The Mazers'
conduct deprived her of her right to privacy and right of enjoyment of her home.  In an effort to
placate the Mazers, she directed her children to maintain a "low profile" and, this, in turn, deprived
her and her children of many simple pleasures of life.  She was unable to invite guests over to her
home because of the foul odors from the septic sewer truck.  She and her family were unable to enjoy
their home, she was unable to have her children invite their friends over.  She was evicted for no
cause and was forced to reallocate her family's finances and expend sums of money which she would
not otherwise have expended.  Her frustration in looking for housing or finding comparable
accommodations was so debilitating that she ultimately turned the responsibility over to one of her
children. She was forced to incur greater commuting expenses and must now be the primary
transportation source for her minor son Abel.  As the head of the family responsible for the welfare
of her children and also the parent who was required to place severe limits on her children so as to
avoid their running afoul of the Mazers, Cathy Apodaca is entitled to emotional harm damages in the
amount of $7,500.

54.  Jose Apodaca suffered emotional distress, embarrassment and humiliation.  On two
occasions, his privacy was violated by Boyd Mazer, who was observed peering into the mobile
home's windows.  Following those incidents, Jose never felt comfortable or at ease in his home.  He
did not know, from one day to another, whether the Mazers' peering eyes would be trained upon him
or his family, even within the purported safety of their residence.

55.  According to Jose's testimony, it fell upon him as the "man of the house" to help his
mother and to spearhead the search for alternative housing.  As a young man, he was forced to

13

shoulder many responsibilities not normally carried by an individual his age, including purchasing a home, arranging for space, arranging for the transportation and set up of the purchased home. While his assistance was necessary and commendable, he would not have had to shoulder this responsibility, but for the Mazers' unlawful conduct.

56.  Jose Apodaca admits that he suffers no lasting effects from the situation, but candidly discusses how the Mazers' actions caused severe emotional distress for him and his family. The Court awards emotional harm damages to Jose Apodaca in the amount of $3,500.

57.  There is a wealth of evidence demonstrating that Mazers did not make a simple mistake, or acted out of simple ignorance or mistaken belief. Rather, the evidence supports a finding of wilful, malicious and intentional misconduct.[3]

58.  Ronald Wilson, one of Mazer's park managers, testified, by deposition, that he had taken a credit application from a prospective tenant who wanted to move into the mobile home park. When Wilson reviewed the credit application with Boyd Mazer, Mazer asked if the applicants had any children and Wilson advised that they had a child. Boyd Mazer refused to allow the couple to move in because they had a child. Wilson advised Boyd Mazer that he could not unlawfully discriminate on the basis of race, color, religion, sex, handicap, marital status or national origin. The admonition was discarded. In explaining Mazer's rationale for not allowing the couple to move in, Mr. Wilson testified:

> ANSWER:   It wasn't the fact that they had a baby. It was the fact that babies grow into teenagers and he doesn't like teenagers.

---

[3] In related litigation, the United States District Court found that Boyd Mazer and Carmen Mazer coerced and intimated their own park managers to turn away families and deny housing to families with children, in violation of the Fair Housing Act. Wilson v. Mazer, CIV 97-1288.

14

QUESTION:  Is that he told you?

ANSWER:    Yes, sir.

QUESTION:  Those specific words?

ANSWER:    Absolutely.

59.  Mr. Wilson testified that on a prior occasion, Mazer declined to rent a trailer to another family, simply stating, "I don't want him here."  He explained, "They've got teenagers."  Even though the manager advised Mazer that teenagers would not be living at the mobile home park, but only visiting from time to time, Mazer stated that he did not even want teenagers visiting.  During this same conversation, Boyd Mazer said, "The next thing you know, I'll have to let every nigger and their children in here."

60.  Eugene Padilla, another of Mazers' Park managers, testified by deposition.  He testified as to Mazer's restrictions concerning rental to individuals of Mexican descent or to families with teenagers.

QUESTION:  How many times was the application denied because the family or the applicant had teenager children?

ANSWER:    It was not denied, because I had orders not to rent to teenagers or Mexicans.  There wasn't any to be denied, because I right away told them, you cannot rent here.

QUESTION:  So then you--

ANSWER:    That's part of why I quit Boyd Mazer.

QUESTION:  So, then, you were the individual who was discriminating against Mexicans and people?

OBJECTION: [Omitted]

QUESTION:   Isn't it true that what you just got finished telling me was that you didn't take applications from people who were Mexicans or had teenagers?

ANSWER:   Because I had orders.

61.   Bernadette Padilla, the spouse of Eugene Padilla, who also worked as Mazers' Park manager, testified by deposition.  In response to a question as to why certain applicants were rejected, she said:

ANSWER:   Yes, they had, like a lot of kids.  You know, some of them had like about three teenagers.  And Boyd had told us not to rent to people with teenagers because he said he liked to rent to people with a couple of kids, small, that they were trained in the park and they grew up to obey the rules.

She further testified:

ANSWER:   There was one incident where we were told not to rent to people from Mexico because they brought their aunts and uncles and everything else.

62.   Bernadette Padilla also testified that Boyd Mazer made another tenant move because she had a teenage son.  Mrs. Padilla testified:

ANSWER:   There was some [tenants of Mexican descent] living there when we first started working there.  There was one there that they made the lady tell her son to move out because he was a teenager and he grew up basically.  And they just made her move to another park.

QUESTION:   Who is "they"?

ANSWER:   Boyd and Carmen didn't want them there and Eugene, I guess, he was Boyd's . . . .  Boyd would tell him something and Eugene would go do it.

63.   Bernadette Padilla testified as to their concerns with approving Rafael Padilla's rental

agreement with the Apodacas.  She stated:

> ANSWER:    [B]efore we moved, he had allowed Rafael to rent to a family with teenagers.  And we were kind of afraid because that's the time Boyd took over the park.  And Eugene felt like, oh, Boyd is going to be really mad because we let Rafael rent to these people [the Apodacas].  We felt like he didn't even want our son there at the time, but he was already living there.  And that's the time that Boyd was angry because we had rented to those people.
>
> He told me and Eugene that he didn't want them there, they were like dogs.  They were going to bring other teenagers and he felt they were probably in gangs.  You know, he was very upset.
>
> So we had told Rafael, "You know, we really wish you wouldn't rent to these people because Boyd is going to be mad at us."  But Rafael had said, "Well, I'm going to rent to them anyway."
>
> QUESTION:  Do you remember the name of the people?
>
> ANSWER:    Yes I do.  There last name is Apodaca.

64.  The Mazers' conduct toward the Apodacas was willful, malicious and despicable. Notwithstanding prior admonitions that discrimination against individuals because of their race, ethnicity or family status was against the law, the Mazers intended to and did discriminate against all of the Apodacas in violation of the Apodacas' federally protected rights.  The foregoing evidence also demonstrates a pattern and practice of discriminatory conduct based on race, ethnicity, national origin and family status.

65.  The Mazers' discriminatory conduct does not arise out of a single, isolated incident.  The evidence presented primarily by their former managers indicates that the Mazers have discriminated against a wide variety of individuals.  The evidence of other wrongs or bad acts was considered by

the Court to show the Mazers' longstanding pattern of intentional conduct and absence of mistake.

66.   Mazers gave specific instructions to their park managers to violate the law.  Mazers' comments are indicative of their contempt for American laws and rights of individuals.

67.   In United States v. Winters, CIV 90-1029, Chief Judge Juan Burciaga penalized defendants who were owners of a mobile home park by imposition of substantial compensatory, emotional harm and punitive damages.  The punitive damage awards amounted to $25,000 for each of the successful plaintiffs.  The Mazers' conduct in the present case is no less severe than the defendant's conduct in Winters, nor any less deserving of a punishment.

68.   Evidence presented by Plaintiffs indicates that Mazers have substantial assets.  In August 1994, the Mazers divorced and each party was awarded a separate estate.  Carmen Mazer, a career employee at the U.S. Forest Service, has an executive level salary and accrued a substantial civil service retirement.  While retirement funds may not be reachable by garnishment proceedings, the Court notes that notwithstanding the amounts that will be paid pursuant to the judgment to be entered herein, Carmen Mazer will still have a very substantial private estate.

69.   Carmen Mazer maintained a separate account at Sunwest Bank, No. 0150908903.

70.   Boyd Mazer acquired a separate inheritance from his father and also maintained separate accounts at Sunwest Bank, No. 0130007990 and at the First National Bank of Belen.

71.   In addition, the Mazers owned substantial community property.  The most substantial asset appears to be the mobile home parks on Second and Fourth streets in Albuquerque, New Mexico.  Additionally, they owned joint accounts at the First Security Bank No. 880026269, and at the New Mexico Federal Credit Union, No. 289377.  The Mazers also maintained a joint checking account at Sunwest Bank, No. 0131977001.

18

72.   Indicative of their wealth and ability to respond in damages, the Mazers maintained various investment accounts, including the Dreyfus Fund Account and various municipal bonds, including those held at Cyprus Hill Municipal; Northwest Harris County; St. Charles City Industrial Development Authority in Missouri; Homestead, Texas Municipal Bonds; Fort Bend City, Texas Municipal Bonds; and Housing Authority of Prince George City Maryland.

73.   The Mazers owned a residence at 8730 Rio Grande Blvd., N.W., Albuquerque, New Mexico.

74.   The Mazers owned a classic car collection consisting of seven classic vehicles.  They further own various automobiles and recreation vehicles, including a 1993 Buick Roadmaster, a 1990 Sunbird and trailer, a Pace Arrow recreation vehicle, a 1969 Ford truck and camper, and numerous vehicles associated with a business owned by the parties at Toby's Westport Marine and Salvage.

75.   The Mazers' marine and salvage business was located on four acres of property and had substantial inventory, equipment, buildings, both operating and non-operating tools, fixtures, hardware, office and apartment, contents, and additional house trailers.

76.   The Mazers owned interests in various IRA investment funds.

77.   The Mazers owned a residence at 831 Ranchitos Road in Los Lunas, Valencia County, New Mexico, consisting of a house and 1.08 acres of land, and had a 99-year lease on recreation property located at Elephant Butte Lake.

78.   The Mazers' North Court Mobile Home Park has 78 spaces, which rent for a minimum of $255 per month.  Assuming full rentals, the Mazers receive rental income of nearly $20,000 per month before taxes and deductions of minimal operating expenses.  Even during the time when the Mazers sold the park on a real estate contract, they were receiving $8,000 per month in contract

19

payments.

79.  There is evidence that the Mazers created sham corporations during the pendency of this and other lawsuits against them in an attempt to defraud potential creditors by creating fictitious encumbrances on their own property.  In 1996, after two federal lawsuits had been filed in New Mexico against Mazers, an entity called "SW Equity" filed a series of mechanics' liens against Toby's Marine and Salvage Yard and Arizona assets.  The address of SW Equity is listed at 515 Rankin Road, Suite 114, Albuquerque, New Mexico 87107, which is the same address that the Mazers later used to created a limited liability company known as Desert Wades.

80.  Similarly, an entity known as Hermosa Enterprises filed substantial mechanics' liens against Carmen Mazer's residence on March 1, 1997.  The claim of lien uses identical typeface as do those used by the SW Equity and were witnessed by the same notary public.

81.  "Hercules Investment Group" filed a mechanics' lien against Toby's Marine and Salvage Yard on March 21, 1997.  The State Corporation Commission shows that no corporation exists in New Mexico or is licensed to do business as SW Equity, Hermosa Enterprises or Hercules Investment Group.

82.  Since the commencement of litigation, the Mazers encumbered their property by executing large mortgages on the park with Interamerica Bank N.A., and T. Brown Constructors, Inc.  Curiously, T. Brown Constructors uses the same 515 Rankin address that is shown as SW Equity's address.

83.  Mazers organized numerous limited partnerships and limited liability companies and engaged in a series of transactions with the apparent motive to shield their real property from judgments and to defraud creditors.  Public records indicate that Mazers transferred their businesses

in the following manner:  (1) Toby's Marine and Salvage Yard to BCM Properties Ltd. on January 28, 1998; (2) North Court Mobile Home Park to BCM Real Estate, Ltd. on March 3, 1998; and (3) Arizona assets to Arizona Assets, Ltd. on March 2, 1998.  The Mazers are listed  as "managing members" for the general partners of all three of these partnerships.  It is apparent that the Mazers are engaged in a shell game, seeking to hide their substantial financial wealth and deprive creditors of funds that are lawfully due them.

84.  Mazers' conduct toward the Apodacas, was malicious, willful and in bad faith; their contemptuous conduct towards this Court, and their ongoing conduct in a patent attempt to defraud their creditors merits an award of punitive damages in the amount of $75,000 in favor of the Plaintiffs.

85.  The punitive damage award bears a reasonable relationship to the actual damages suffered and, based on the evidence of the Mazers' wealth, is well within their ability to pay, yet not so devastating and draconian so as to bankrupt the Mazers.

## Recommended Disposition

That the Court award the Apodacas the following sums from and against Boyd Mazer and Carmen Mazer, who are jointly and severally liable for damages awarded to the Apodacas:

a.  $535.00 representing the difference between the cost of the denied housing and the replacement housing.

b.  $393.84 representing utility hook-up charges for the replacement home.

c.  $80.00 represents hitch removal from the replacement home.

d.  $3,750.00 representing denial of Apodacas' quiet enjoyment and privacy of their home.

e.  $350.00 represents all increased mileage charges incurred by the Apodacas.

f.  $35.00 represents the Apodacas' park application fee for replacement housing.

g.  $5,000.00 for Abel Apodaca, representing emotional harm suffered.

h.  $3,500.00 for Jose Apodaca, representing the emotional harm he suffered.

i.  $7,500.00 for Cathy Apodaca, representing the emotional harm she suffered.

j.  $75,000.00 represents punitive damages for the malicious, willful  intentional discrimination.

k.  The total amount awarded, excepting costs and fees, is $96,143.84.

l.  Attorney fees are authorized pursuant to 42 U.S.C. § 3613(c)(2).  Accordingly, the Court determines that Plaintiffs recover their costs and reasonable attorney fees.  An attorney fee application documenting time spent, the service performed, the rates charged and the hourly rate of the attorney or attorneys performing the services shall be provided to the Court within ten days.

m.  The Court denied Apodacas' claims under the New Mexico Owner-Resident Relations Act, NMSA 1978 § 47-8-1 *et. seq.*, and under New Mexico's Unfair Trade Practices Act, NMSA 1978 § 57-12-1 *et seq.*, finding that awards under these acts would be duplicative of those already granted.

_____
Lorenzo F. Garcia
United States Magistrate Judge

ATTORNEYS FOR PLAINTIFFS:
Jane Yee, Esq.
Cindy Domingue-Hendrickson, Esq.


DEFENDANTS:
Boyd Mazer, pro se
Carmen Mazer, pro se